Lou **PARTENZA**, Billie Hagner, Pete Scarlatos, Lou Smith, Joe Beyers, and Dan Kane, individually, in their Capacities as Trustees of the Teamsters Joint Council No. 16 Pension Fund, and in their Capacities as Members of the Teamsters Joint Council No. 16, IBT Executive Board, and Teamsters Joint Council No. 16, Plaintiffs,

v.

Jasper **BROWN**, Joel Lefevre, Clara Levine, and Chris Silvera, Defendants.

No. 98 Civ. 4265(DC).

United States District Court, S.D. New York.

July 31, 1998.

---

Eisner & Hubbard, P.C. by K. Dean Hubbard, Jr., New York City, for Plaintiffs.

Martin & Bonnett, P.L.L.C., by Susan Martin, Phoenix, AZ, Robert H. Alpert, Jericho, NY, for Defendants.

## OPINION

CHIN, District Judge.

Plaintiffs are members of the Executive Board of the Teamsters Joint Council No. 16 (the "Joint Council") who were recently appointed as Trustees of the Teamsters Joint Council No. 16 Pension Fund (the "Fund"). The incumbent Trustees, however, have refused to relinquish their positions, claiming that they have not been legally removed according to the terms of the Trust Agreement.

Plaintiffs seek a preliminary injunction preventing the sitting Trustees from further holding themselves out as Trustees of the Fund and exercising authority over its assets. *See* Fed.R.Civ.P. 65. They mount a direct challenge to the governing structure by which Trustees may be dismissed, arguing that the Trust Agreement, under which Trustees serve for indefinite terms and are removable only for "just cause," violates the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1132, by unduly insulating Trustees from removal by the participants and beneficiaries of the Fund. Defendants, in contrast, insist that these provisions preserve continuity in the leadership of the Fund and are consistent with the dictates of ERISA. If anything, defendants argue, the provision requiring Trustees to be current officials of their respective Locals serves as an accountability-enhancing device.

The request for preliminary relief is granted, for plaintiffs have demonstrated both irreparable harm and a likelihood of success. Plaintiffs have shown that they are likely to prevail on their claim that the governing Trust Agreement excessively insulates Trustees from effective oversight by the plan's beneficiaries and participants. The following constitute my findings of fact and conclusions of law.

## FINDINGS OF FACT

### A. The Organization of the Council and Fund

1. The Joint Council is a labor organization that assists and directs local unions ("Locals") affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America ("IBT"), AFL—CIO.

2. Forty Teamster Locals, with more than 100,000 Teamster members, participate in the Joint Council.

3. Each affiliated Local elects seven delegates to the Joint Council, and each officer of an affiliated Local automatically serves as a delegate to the Joint Council. These delegates in turn elect the seven-member Executive Board. Elections to the Executive Board take place every four years.

4. Elections are held to determine the officers of affiliated Locals every three years if the Local represents private employees, and every five years if the Local represents public employees. Five of the affiliated Locals represent public employees, while the balance of the Locals have memberships consisting solely of private employees.

5. The Fund was established in 1959 by an Agreement and Declaration of Trust executed by the then Members of the Executive Board pursuant to their authority under § 14(b) of the Joint Council Bylaws.[1]

6. The Fund provides retirement benefits to the officers and employees of the affiliated Locals, but not to the rank-and-file members of the various affiliated Locals. The employ-

---

1. Section 14(b) provides that "the Executive Board may establish such retirement and pension plan as it may deem desirable, and for such purpose may establish a Trust, appoint and re- move Trustees and enter into such Trust Agreement and other agreements as it may deem advisable."

ees need not be union members to be eligible to participate in the Fund.

7. The provisions governing the appointment and removal of the Fund's trustees have, with the exception of a few cosmetic alterations, remained unchanged since their initial adoption.

They are as follows:

The Pension Fund shall be administered by seven (7) Trustees who shall be appointed by the Executive Board of the Council among the officers constituting the Executive Board of Affiliated Local Unions. The said persons shall continue to serve as Trustees so long as they continue as such officers of Affiliated Local Unions, subject, however, to removal for just cause by the Executive Board of the Council in accordance with the procedure set forth in Article XVIII of the International Constitution. In the event of a termination of office, resignation, removal, death, disability or incapacity for any reason on the part of a Trustee, a successor Trustee shall be designated by the Executive Board of the Council.

(Trust Agreement ¶ 1).

8. According to the Trust Agreement, the Executive Board possesses the exclusive power to appoint and remove Trustees of the Fund.

9. The Trust Agreement requires that the "designation or removal of a Trustee shall be evidenced by an instrument of writing signed by the President of Secretary–Treasure of the Council and filed with the Board of Trustees." (*Id.* § 2).

10. By its terms, Trustees need not be Executive Board members.

11. Trustees do not sit for specified terms, but rather serve for indefinite periods of time.

12. Once appointed, the checks by which others exercise some degree of control over the Trustees are only: (a) removal for "just cause" by the Executive Board pursuant to the procedures set forth in Article XIX (formerly Article XVIII) of the IBT Constitution; and (b) loss of elected office in their respective Local.

13. The term "just cause" is not defined in the Trust Agreement.

14. Article XIX of the IBT Constitution sets forth a detailed process by which officers and members of Locals may be tried for certain conduct deemed violative of the IBT Constitution, Local Union Bylaws, or relevant state and federal law, and under which an individual may appeal an adverse result.

15. Triable offenses "consist of, but [are] not [ ] limited to," the following: violation of the IBT Constitution, Local Union Bylaws, or rules of order; violation of the oath of office or oath of loyalty to the Local Union and the International Union; breach of fiduciary obligation; fostering of secession; conduct disruptive of the performance of any union's legal or contractual obligations; disruption of union meetings or assault of an officer or member; crossing an authorized primary picket line; retaliation against a member for filing disciplinary charges or otherwise exercising his right under the Constitution or applicable law; knowing association with any member of associate of an organized crime family or criminal group; commission of racketeering activity; obstruction of an investigation conducted by the Ethical Practices Committee; accepting money in violation of applicable law; and attempt to influence the operation of an employee benefit plan in violation of applicable law. (*See* IBT Const., art. XIX, § 7(b)).

16. An individual charged under Article XIX is usually tried by the Local's executive board. Where a charge is filed by someone who is not a member of the Local to which the accused belongs, however, the accused is tried by the current Executive Board of the Joint Council. If a majority of the Joint Council itself or "[an]other subordinate body" is charged, the trial shall take place before the General Executive Board of the IBT. (*id.* art. XIX, § 4(a)).

17. An unfavorable decision, including a decision not to charge an individual, may be appealed to the Joint Council Executive Board. (*See id.* art. XIX, §§ 1(d), 2(a), (e), 3(b)). The Executive Board's decision may be appealed to the IBT General Executive Board. Finally, an individual may appeal to

"the next [IBT] Convention or to the Ethical Practices Committee, at the option of the appealing party." (*Id.* art. XIX, § 2(a)). During the pendency of an appeal, the decision from which an appeal is taken "shall remain in full force and effect." (*Id.* art. XIX, § 2(b)).

18. IBT Conventions are held once every five years. (*See id.* art. III, § 1).

19. There are no provisions governing the timing of trials, except with respect to trials conducted by the IBT General Executive Board, in which case a decision shall issue within 90 days after the matter has been heard. (*See id.* art. XIX, § 4(b)).

20. All appeals must be taken within fifteen days of notice of the decision. An appeal "shall proceed without unnecessary delay." (*Id.* art. XIX, § 2(b)).

21. Hearings on appeals shall take place no later than ten days from the date notice of the hearing has been served, and a decision on an appeal shall be rendered within sixty days of the date of the hearing. (*See id.*).

22. In recent years, the practice has been for Executive Board members to also serve as Trustees for the Fund. Trustees usually have stepped down after Executive Board elections. This is the first time in recent memory that Trustees who have lost their Executive Board positions have refused to step down when asked to do so by the new Executive Board.

23. Article XIX has never been invoked to remove a sitting Trustee of the Fund.

24. There has never been a direct legal challenge to the Trust Agreement in the Fund's thirty-nine years of existence.

### B. *The Sitting Trustees*

25. Each of the sitting Trustees of the Fund was elected to the Executive Board before being appointed to administer the Fund.

26. Angelo Martin was installed on the Executive Board on January 5, 1993, and was appointed as Trustee by the Executive Board on April 14, 1993. During this period, he also served as the Secretary–Treasurer of Local 210, IBT, AFL—CIO.

27. Jasper Brown, who is the President of Local 277, IBT, AFL—CIO, was installed as an Executive Board member on October 12, 1993, and was appointed by the Executive Board to be a Trustee on November 9, 1993.

28. Clara Levine, the Secretary–Treasurer of Local 840, IBT, AFL—CIO, became an Executive Board member on July 24, 1994, and became a Trustee on July 27, 1994.

29. Joel LeFevre, the duly elected Secretary–Treasurer of Local 840, IBT, AFL—CIO, was installed on the Executive Board May 2, 1995, and was appointed as a Trustee on June 13, 1995.

30. Chris Silvera, the Secretary–Treasurer of Local 808, IBT, AFL—CIO, was elected to the Executive Board on October 12, 1993, and was appointed as a Trustee of the Fund on October 17, 1996.

31. Each of the sitting Trustees has held office for his or her respective Local for at least ten years.

32. Twenty-two sitting Trustees have lost their positions by virtue of ceasing to be officers of an affiliated Local. (*See* Miranda Aff. ¶ 3). The precise circumstances under which each of these individuals lost his or her elected office are unclear, although in one instance it appears that a Trustee actually lost his position by losing an election within his Local. Most of these individuals simply resigned for unknown reasons.

### C. *The Conflict Arises*

33. Plaintiffs Lou Partenza, Billie Hagner, Pete Scarlatos, Lou Smith, Joe Beyers, and Dan Kane were elected as officers of the Executive Board in mid-February 1997. Defendants Brown, LeFevre, Levine, and Silvera were voted off the Executive Board during this election.

34. In November 1997, Kane was appointed to fill the vacancy created by the resignation of Martin.

35. No effort was made to remove the sitting Trustees until nearly a year after the 1997 Executive Board elections. On February 26, 1998, the Board approved a motion to remove Brown, LeFevre, Levine, Silvera,

and Martin as Trustees and appointed plaintiffs in their stead.

36. No specific reason was cited for removing these Trustees, and no effort was made to invoke the disciplinary proceedings set forth in Article XIX of the IBT Constitution. The motion passed.

37. Despite receiving notice of their removal, the sitting Trustees, with the exception of Martin, refused to resign or relinquish control over the Fund's assets.

38. On or about March 12, 1998, Partenza and Smith were seated as Trustees after vacancies occurred.

### D. *Prior Proceedings Before This Court*

The would-be Trustees filed this action on June 18, 1998, against the sitting Trustees and the Locals they represent, and sought by order to show cause a temporary restraining order and preliminary injunction. They alleged violations of ERISA, as well as the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185. Plaintiffs subsequently amended the complaint, withdrawing their LMRA claim and all claims against the Locals, but adding an ERISA claim that asserts that the sitting Trustees' failure to "honor and give effect to their removal" itself constitutes unlawful entrenchment in violation of ERISA. (Am.Compl.¶¶ 29–30).

After hearing oral argument on June 19, 1998, I issued an order temporarily enjoining defendants from making any "large or extraordinary expenditures of or decisions regarding the investment or use of the Fund's assets ... pending the final determination of this action." (6/19/98 Order).

## CONCLUSIONS OF LAW

### A. *Applicable Legal Standards*

■ A preliminary injunction is "an extraordinary remedy ... [that] should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 117 S.Ct. 1865, 1867, 138 L.Ed.2d 162 (1997) (quoting 11A Charles Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948, at 129–30 (2d ed.1995)).

■ To obtain preliminary injunctive relief, a party ordinarily must demonstrate (1) a threat of irreparable harm and (2) either (a) a likelihood of success on the merits or (b) "sufficiently serious questions going to the merits to make them fair grounds for litigation *and* a balance of hardships tilting decidedly towards the plaintiff." *See Jayaraj v. Scappini*, 66 F.3d 36, 38 (2d Cir.1995); *Alvarez v. City of New York*, 2 F.Supp.2d 509, 513 (S.D.N.Y.1998).

■ Where, as here, an injunction sought by a party would be mandatory in nature, in the sense that it would alter the status quo by requiring some positive act or would "provide the movant with substantially all the relief sought," the movant must satisfy the more stringent standard by "mak[ing] a clear or substantial showing of a likelihood of success ... and a strong showing of irreparable harm." *CERCPAC v. Health & Hosp. Corp.*, 920 F.Supp. 488, 494 (S.D.N.Y.1996), *aff'd,* 147 F.3d 165 (2d Cir.1998); *see also Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir.1995).

### B. *Application*

#### 1. *Irreparable Harm*

■ As newly-appointed Trustees of the Fund, plaintiffs have shown that defendants' continued exercise of control over Fund assets would amount to irreparable harm that would not be adequately remedied by monetary damages awarded at a later date. As a preliminary matter, "[c]ontinuance of any trustees serving contrary to the wishes ... of the appointing authority inherently causes irreparable injury." *International Union of Bricklayers & Allied Craftsmen Local No. 5 v. Hudson Valley Dist. Council Bricklayers & Allied Craftsmen Joint Benefit Funds*, 858 F.Supp. 373, 376 (S.D.N.Y.1994). Moreover, plaintiffs have been excluded from at least one Trustee meeting, participation in Fund-related decisions such as the selection of an insurance carrier and policy, and other Trustee activities that affect the proper administration of the Fund. (*See* Kane Aff. ¶ 9). Finally, by holding themselves out as the Fund's legitimate Trustees, rightly or wrongly, defendants have sown a degree of confu-

sion that arguably damages the reputation and image of the Joint Council, the Executive Board, and the individual plaintiffs. *See Mason Tenders Dist. Council of Greater New York v. Laborers' Int'l Union of N. Am.,* 884 F.Supp. 823, 833 (S.D.N.Y.1995) ("It has been held that damage to a labor union's reputation and image constitute irreparable injury."). Hence, plaintiffs have more than satisfied the first element for preliminary relief.

### 2. *Likelihood of Success*

The next issue that must be addressed is whether plaintiffs have clearly shown that their lawsuit is likely to succeed. For the reasons that follow, I conclude that plaintiffs have satisfied their burden on this point as well.[2]

Plaintiffs principally argue that the Trust Agreement violates ERISA to the extent that it excessively insulates Trustees from removal by the Fund's participants and beneficiaries. The issue of likelihood of success thus turns on the probability that plaintiffs can show at trial that the Trust Agreement unduly entrenches sitting Trustees.

ERISA requires that, as fiduciaries, trustees of pension funds must "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A). Fiduciaries must "exercise their conscience but cannot extend their terms once recalled by their electorate." *International Union of Bricklayers & Allied Craftsmen Local No. 5,* 858 F.Supp. at 375.

■ Courts have held that, even in the absence of wrongdoing by particular trustees, trust agreements that "excessively protect fund trustees from removal" violate ERISA "because they insulate trustees from responsibility for failure to carry out their fiduciary duties." *Levy v. Local Union No. 810,* 20 F.3d 516, 519 (2d Cir.1994). For trust arrangements to comply with ERISA,

they must subject the conduct of the fund's trustee to "effective oversight on behalf of plan participants and beneficiaries." *Id.* (quoting Department of Labor, Pension Benefit Welfare Programs, Op. 85–41 A., Dec. 5, 1985, *2–3 (1985 ERISA LEXIS 3)) (hereinafter "DOL Opinion"). Each plan must be scrutinized "under [its own] facts and circumstances." *Id.* The test to determine whether unlawful structural entrenchment exists is whether a fund's governing provisions permit the termination of their fiduciaries' services "on reasonably short notice under ... circumstances so the plan would not become locked into an arrangement that may become disadvantageous" to the benefit fund. *Id.* at 520; *see also Liss v. Smith,* No. 95 Civ. 1256(HB), 1997 WL 139530, at *1 (S.D.N.Y. Mar.26, 1997).

■ Plaintiffs' theory of excessive entrenchment consists of a twofold attack: that the Trust Agreement's failure to impose time limits on the tenures of Trustees coupled with its restriction of the Executive Board's authority to remove Trustees only for "just cause" overly insulates Trustees from effective oversight by beneficiaries of the Fund. Plaintiffs' legal theory is a sound one. And on the present record, they are likely to show that the Fund's participants are not able to terminate existing fiduciary relationships on "reasonably short notice," and that, accordingly, the Fund could be "locked into an arrangement that could become disadvantageous" to the Fund.

#### a. *Indefinite Terms*

The Trust Agreement's failure to establish specified terms is itself troubling. Courts have repeatedly held, and the U.S. Department of Labor has unambiguously declared, that life tenures are generally violative of ERISA. *See* DOL Opinion, at *2 ("The Department is generally of the view that a lifetime term of appointment for a pension fund trustee would be inconsistent with ERISA's fiduciary responsibility provision").

---

**2.** Insofar as defendants suggest that this action is barred by the doctrine of laches, the argument has no merit. The Executive Board did not formally remove the sitting Trustees until February

ary of this year, after efforts to resolve the dispute privately failed. Thus, defendants have not shown undue delay in prosecuting this action.

While the Trustees here do not explicitly serve for life, the open-ended structure permits tenures that are tantamount to lifetime terms, given the operative effect of its other provisions (as discussed below). At a minimum, the present structure allows Trustees to serve indefinitely and contrary to the wishes of the Fund's participants and beneficiaries. The absence of limited terms for Trustees strongly suggests, by itself, that the structure may violate ERISA. *See International Union of Bricklayers & Allied Craftsmen*, 858 F.Supp. at 375 ("To permit ERISA fund trustees to remain in office contrary to the wishes of the highest authority in their appointing organization would [be] ... contrary to the objectives of ... ERISA ....").

### b. *Requiring a Showing of Just Cause to Remove a Sitting Trustee*

The Trust Agreement's limitation of the Executive Board's authority to remove Trustees to circumstances rising to the level of "just cause" further entrenches sitting Trustees by making it exceedingly difficult for the participants' representatives to terminate the Trustees' services. There is substantial legal support for the proposition that a trust provision allowing removal of fiduciaries only on condition of proving malfeasance violates ERISA. As courts have observed, the principle of easy removal on reasonably short notice "may be frustrated where a plan sponsor ... can [remove a trustee and appoint a successor] only upon successfully bringing such charges as misfeasance or incapacity." *Levy*, 20 F.3d at 519 (quoting DOL Opinion, at *3); *see also Mobile, Alabama–Pensacola, Florida Bldg. & Constr. Trades Council v. Daugherty*, 684 F.Supp. 270, 277 (S.D.Ala.1988) (same); *cf. Team-*

*sters Local No. 145 v. Kuba*, 631 F.Supp. 1063, 1070 (D.Conn.1986) (holding that purpose of labor laws would be undermined if appointing body "could not remove at will any of their trustees in whom they lacked confidence without having to demonstrate 'proper and just cause' for such removal").

Although the phrase "just cause" is not defined in the Trust Agreement,[3] the Trust Agreement's explicit invocation of the procedure set forth in Article XIX of the IBT Constitution strongly suggests that "just cause" as used in the Trust Agreement is synonymous with "malfeasance." Article XIX delineates the process by which members or officers may be tried for "charges" deemed violative of the International Constitution. Triable offenses "shall consist of, but [are] not limited to" violation of the Constitution, Local Union Bylaws or rules or order; breach of fiduciary duty; fostering secession; disrupting the performance of any union's legal or contractual obligations; and obstructing a union investigation.[4] While the panoply of chargeable offenses is not strictly "limited to" those identified in the IBT Constitution, all signs suggest that the Article XIX process is intended to discipline union members and officers for affirmative misconduct. Nothing in either the Trust Agreement or the IBT Constitution demonstrates that mere policy disagreement or ineffective leadership would rise to the level of a chargeable offense. Consequently, these would not appear to be grounds for removal of a Trustee.

The insulative effect of the "just cause" requirement is exacerbated by the fact that the Executive Board is the only body with removal power over the Trustees. Because

---

**3.** Neither side has come forward with any credible evidence as to the intentions of the original founders of the Fund in employing the phrase, "just cause." Defendants have submitted the affidavit of Anthony Rumore, the current President of the Joint Council, who expresses his belief that "[b]y providing the Pension Fund Trustees who are required to be Local Union officers but who are not required to be identical with the current Executive Board regime, the settlors [of the Fund] were expanding the representative nature of the Board of Trustees." (Rumore Aff. ¶ 10). Because he has no personal knowledge of the intentions of those who originally executed the Trust Agreement in 1959,

however, his speculation provides no illumination on this point.

**4.** This definition of "just cause" is consistent with general practice in the field of labor-management relations. *See, e.g., City of Mount Vernon v. State of New York Bd. of Equalization & Assessment*, 92 A.D.2d 985, 461 N.Y.S.2d 493, 495 (3d Dep't 1983) (approving definition of "just cause" for removal of public official as "affirmative misconduct or malfeasance in office or the lack of such skill and capability as is necessary to be an effective" official).

no such removal power lies elsewhere, there is nothing to meaningfully offset the restrictive effect of the "just cause" provision.

### c. *Time–Consuming Removal Process*

Further preventing the reasonably speedy dismissal of a recalcitrant Trustee is the removal process itself, which simply tracks the internal disciplinary procedure for the IBT. To trigger the process, a formal complaint must be filed against an individual. The person must then be charged with misconduct and tried pursuant to Article XIX of the IBT Constitution. After an initial decision has been rendered, the accused has the right to appeal an adverse decision to at least two additional bodies.

While a decision to expel a member or remove an individual from office remains in force pending an appeal, several months usually pass between the time a complaint is filed and the date that the hearing panel hands down its decision. *See, e.g., Taschner v. Hill*, 589 F.Supp. 127, 129 (E.D.Pa.1984) (five months alone passed before the Local rendered its ruling). In the event the initial decision is appealed, the process typically takes many months, if not years, to complete. *See, e.g., Bollitier v. IBT*, 735 F.Supp. 612, 615–16 (D.N.J.1989) (entire disciplinary process resulting in member's expulsion took over one year), *aff'd*, 888 F.2d 1379 (3d Cir. 1989); *Taschner*, 589 F.Supp. at 129 (decision by first appellate body still pending twelve months after initial decision). In the best case scenario, a Trustee charged with misconduct will be removed from the Board in a few months. In the worst case scenario, however, such as where the individual prevails at the initial stage and no charges are filed or no sanction is imposed, it may take more than a year for the case to wind its way through the framework set out by Article XIX.

The Executive Board's power to remove a Trustee, in short, is severely curtailed in the following manner: it must show affirmative misconduct by a Trustee; and it must successfully navigate the elaborate and often time-consuming multi-step procedure established by Article XIX of the IBT Constitution.

### d. *The Requirement that Trustees be Officials of Affiliated Locals: Is it Democracy Enhancing?*

■ The remaining issue to be considered is whether the provision requiring that Trustees be officers of their respective Locals saves the structure by providing an effective means of removing Trustees. Put simply, the question is this: Can the Fund's participants make use of this provision to hold Trustees accountable for their decisions in a reasonably efficient manner? The prerequisite does ensure that Trustees of the Fund, at a minimum, are eligible participants in the Fund. At best, however, this requirement appears to be just that: a minor threshold condition for eligibility, not an effective tool for ensuring accountability for Trustees' decisions.

There are several reasons why this requirement does little to check wayward Trustees. First, it does not actually provide a mechanism by which participants and beneficiaries may affirmatively vote to remove a sitting Trustee. If that were the case, one could then credibly argue that the Fund's participants are able to elect Trustees every three or five years, hardly an unreasonable length of time for trustees to serve. But that is not the case; the requirement at issue here offers no such opportunity for participants and beneficiaries to directly express their preferences for Trustees.

Second, because the beneficiaries and participants are not the at-large membership of the various Locals, but rather constitute a smaller subset of voters in Local elections, any effort to use a general union election to remove a sitting Trustee of the Fund, while not theoretically impossible, remains an extremely difficult task. Votes of beneficiaries and participants would be diluted by the at-large membership within any particular Local, posing arguably insurmountable barriers to any concerted effort by such individuals to remove a Trustee.

Third, as a result, a situation could arise where beneficiaries of and participants in the Fund desire to remove a Trustee, but the Trustee would be immunized from removal because sufficient numbers of nonparticipants of the Fund believed that the Trustee

was doing a fine job as an officer of the Local. By virtue of wearing two hats and satisfactorily performing his or her duties wearing the "officer" hat, the Trustee could then successfully entrench himself or herself against removal for conduct as a Trustee that fails to constitute "just cause" but nevertheless is contrary to the best interests of the Fund's beneficiaries and participants. Hence, the Trust Agreement appears to permit Trustees to continue to serve on the Board even though they are no longer acting "solely" in the interest of the Fund's beneficiaries and participants.

Fourth, even assuming political coordination were possible to oust a Trustee by securing his electoral defeat, the mechanism would be of no value at all to beneficiaries and participants who do not belong to the Local of which the intransigent Trustee is an officeholder and member. In other words, the requirement in theory offers only one Local's participants (out of forty) with any means of voting out a Trustee.

Fifth, there is, in fact, nothing in the record to show that this requirement serves as an effective device to ensure fiduciary accountability. While the evidence shows that twenty-two Trustees have lost their seats by virtue of no longer being an elected official of their respective Local, it is unclear how many lost their positions by losing an election within their Local (the record suggests only one such individual), and assuming any actually lost an election, the record is devoid of facts tending to show that these persons failed to maintain their elected office in part because of perceived dissatisfaction with their performance as Trustees of the Fund. The undis-

puted evidence does indicate, by contrast, that the sitting Trustees have held elective office in their Locals for at least ten years, and in some instances, even longer, suggesting that a recalcitrant Trustee could serve tenures as long as a decade or more. Hence, the evidence fails to suggest that beneficiaries of and participants in the Fund would be able invoke the requirement to oust Trustees who no longer command their support.

In the end, the arrangement here most closely resembles the fund plan struck down by courts in *Daugherty*, 684 F.Supp. 270, and *Levy v. Local Union Number 810*, 20 F.3d 516 (2nd Cir.1994), rather than the framework upheld in *Joint Council 18*.[5] In *Daugherty*, the District Court for the Southern District of Alabama held that a trust plan that provided for lifetime tenure for trustees subject to removal based on a showing of "breach of fiduciary duty or other malfeasance, misfeasance or nonfeasance in the execution of the trust" or incapacity violated ERISA. 684 F.Supp. at 280–81.

Similarly, in *Levy*, 20 F.3d 516, the Second Circuit affirmed Judge Knapp's decision striking down two pension fund provisions as violative of ERISA: (1) one that limited removal authority by the appointing body to "malfeasance"; and (2) another that precluded any international trustee from a voice in selecting or removing a trustee. Here, as there, the almost "unlimited tenure" of Trustees appears to provide "too much continuity" by "insulat[ing] the plan trustees from any and all oversight on behalf of the plan beneficiaries." *Id.* at 520.[6]

---

5. Defendants insist, incorrectly, that *International Broth. of Teamsters, Joint Council 18, v. New York State Teamsters Council Health & Hosp. Fund*, 903 F.2d 919 (2nd Cir.1990), is "controlling." There, the challenged provisions required that trustees be automatically removed after four-year terms or loss of elected union office; and distributed the power to appoint or remove trustees among other joint councils and local unions where before such authority had been vested in a single joint council. *Id.* at 921. In contrast, here, Trustees serve for indefinite terms, and none of the applicable provisions, including that which simply requires Trustees to be officers of an affiliated Local, can properly be characterized as "reduc[ing] ... the opportuni-

ties of ... trustees to entrench themselves." *Id.* at 923.

6. Defendants contend that the facts of *Levy* are distinguishable from the present circumstances partly because there was evidence there that the trustees enacted the challenged amendments specifically to entrench themselves. But the amendments at issue were enacted in 1974 and not challenged until twenty years later, and the court focused on the insulating effect of the provisions, not on the actual conduct of the sitting trustees. *See Levy*, 20 F.3d at 519–20. In short, the existence or absence of bad faith conduct by defendants was not crucial to the decision.

Overall, the framework established by the Trust Agreement arguably fails to allow removal of Trustees "on reasonably short notice," and instead appears to permit "trustees to remain in office contrary to the wishes of the highest authority in their appointing organization." *International Union of Bricklayers & Allied Craftsmen,* 858 F.Supp. at 375. Such a state of affairs turns the Fund into a "potentially independent source[ ] of power contrary to the objective" of ERISA. *Id.*

For the foregoing reasons, plaintiffs have shown that the challenged provisions of the Fund likely violate ERISA by unduly protecting sitting Trustees from removal contrary to the desires of the Fund's beneficiaries and participants.[7] Accordingly, they have demonstrated a likelihood of success on their claim.

### CONCLUSION

Plaintiffs' application for a preliminary injunction is granted. Defendants Brown, LeFevre, Levine, and Silvera are hereby enjoined from holding themselves out as Trustees of the Fund or exercising any control over its assets pending resolution of this action. Plaintiffs are hereby installed as Trustees of the Fund, provided that, pending final resolution of this case on the merits, they may not make any extraordinary expenditures or engage in any extraordinary transactions on behalf of the Fund without defendants' consent or the prior approval of the Court. The temporary restraining order entered on June 19, 1998, is dissolved.

The parties shall appear for a pretrial conference on August 13, 1998, at 11:00 a.m.

SO ORDERED.

---

7. Because plaintiffs are entitled to preliminary relief based on their first claim, I need not address the likelihood of success of the new ERISA claim, namely, that defendants' refusal to step down when asked to do so by the Board itself constitutes unlawful entrenchment.