**BEACON HILL CBO II, LTD. and Beacon Hill CBO III, Ltd., Plaintiffs,**

v.

**BEACON HILL ASSET MANAGEMENT LLC (f/k/a Beacon Hill Asset Management Limited Liability Company), Defendant.**

No. 02 Civ. 9229(GEL).

United States District Court, S.D. New York.

Jan. 22, 2003.

Steven Wolowitz, Mayer, Brown, Rowe & Maw, New York City (Richard A. Spehr, Henninger S. Bullock, on the brief), for plaintiffs Beacon Hill CBO II, Ltd. and Beacon Hill CBO III, Ltd.

Joel M. Miller, Miller & Wrubel P.C., New York City (Charles R. Jacob III, Teresa A. Gonsalves, on the brief), for defendant Beacon Hill Asset Management LLC (f/k/a Beacon Hill Asset Management Limited Liability Company).

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiffs Beacon Hill CBO II, Ltd. ("CBO II") and Beacon Hill CBO III, Ltd. ("CBO III") (collectively the "Issuers") entered into portfolio management agreements on July 19, 2001, and August 7, 2002, respectively ("Portfolio Management Agreements" or "Agreements"), with defendant Beacon Hill Asset Management LLC ("Beacon Hill" or "Portfolio Manager"), covering plaintiffs' investment portfolios that total over $650 million in managed assets. These agreements formed part of a larger series of transactions by which plaintiffs issued securities commonly known as collateralized bond obligations. On November 19, 2002, the Issuers filed this lawsuit against Beacon Hill, and moved by order to show cause for various forms of relief. The Issuers sought a temporary restraining order ("TRO") prohibiting Beacon Hill, pending a hearing, from destroying any document or record relevant to this action and from collecting any fees or compensation in connection with plaintiffs' portfolios or making any extraordinary payments, distributions, withdrawals or redemptions from plaintiffs' assets, or payments to defendant's principals or current or former affiliates. They also sought a preliminary and permanent injunction removing Beacon Hill as Portfolio Manager in favor of a new portfolio manager designated by plaintiffs. The Court granted the TRO on November 19, 2002. Having considered the thoughtful and thorough presentations of both parties in appearances before the Court on November 22, 2002, November 26, 2002, and December 12, 2002, and in submitted memoranda, the Court vacated the TRO on December 19, 2002, and now denies plaintiffs' request for a preliminary and permanent injunction.

## BACKGROUND

This action concerns two securitization transactions, commonly known as CBOs (Compl.¶ 1), established and governed by a collection of transaction documents including Portfolio Management Agreements between Beacon Hill and CBO II (Pls.Ex. B) and between Beacon Hill and CBO III (Pls.Ex. C), Indentures with The Chase Manhattan Bank as Trustee (Irwin Opp. Aff. Exs. A, B), Collateral Acquisition Agreements, Collateral Administration Agreements, Offering Memoranda (see, e.g., Dyer Rebuttal Aff. Ex. H), Securities Purchase Agreements, Securities Account Control Agreements, and Hedge Agreements (collectively "Transaction Documents"). (See generally Dyer Rebuttal Aff. Ex. J and Irwin Opp. Aff. Ex. D.) Neither all of these Transaction Documents nor all of the parties to those agreements are before the Court. The parties

are in agreement, however, about the essential nature of the relationships.

Beacon Hill manages a pool of capital that has been raised from investors ("the Investors"). The plaintiff Issuers are entities created for the limited purpose of issuing bonds, thereby raising the capital which is used to purchase assets, which are then pledged to a trustee bank ("the Trustee") under an indenture agreement, permitting them to serve as collateral for the bonds. The Issuers have contracted with Beacon Hill as Portfolio Manager to manage and invest the assets pursuant to the terms of the indenture. Under the terms of the contract, the Portfolio Manager has discretion to manage the assets within the limits set by the indenture, and the Issuers have no right to direct the actions of the Portfolio Manager, to change its instructions as set forth in the indenture, or to unilaterally terminate Beacon Hill's status as Portfolio Manager without cause. Unquestionably, Beacon Hill as Portfolio Manager acts as a fiduciary for the benefit of others. The assets it manages are owned by the Issuers, pledged to the Trustee, and ultimately invested for the benefit of the Investors, who lent the money that was used to purchase them in the first place and who are to receive the proceeds in the form of interest and eventual repayment of the principal of the bonds.

The instant lawsuit has been brought by the Issuers, seeking to end Beacon Hill's management of the portfolios. The Port-folio Management Agreements between the Issuers and Beacon Hill outline procedures for terminating the Portfolio Manager "for cause" and procedures for resignation by the Portfolio Manager.[1] On this motion, the Issuers have not sought to invoke these procedures, or to assert that one of the contractually-specified grounds for termination for cause has occurred.[2] Rather, they claim that they have an absolute right to remove the Portfolio Manager because of their loss of trust and confidence in Beacon Hill, although such a loss of confidence is not specified in the Agreements as a basis for removal, and the Agreements accordingly provide no specified procedure for a termination on that ground.

The Issuers trace their desire to oust Beacon Hill as their Portfolio Manager to reports beginning in October 2002 about the financial losses of two hedge funds managed by Beacon Hill. These losses eventually led to an SEC investigation, and a civil suit by the agency resulting in the entry of a consent decree. (Compl. ¶¶ 21–35.) Plaintiffs allege that they have lost trust and confidence in Beacon Hill, their fiduciary, because of,

> among other things: the SEC's conclusions that Beacon Hill has provided false or misleading information about the hedge funds that it managed, in violation of the federal securities law; the market's highly negative reaction to the SEC's investigation of and conclusions regarding Beacon Hill; Beacon Hill's

---

1. The July 2001 Portfolio Management Agreement between CBO II and Beacon Hill and the August 2002 Agreement between CBO III and Beacon Hill "are similar in substance and in purpose" with "only slight differences in the language of their provisions" (Pls. Mem. at 4) and will be discussed interchangeably for purposes of plaintiffs' motion for injunctive remedies.

2. Plaintiffs allege in the Complaint that they may terminate the Portfolio Manager for cause because Beacon Hill violated the "key man" provision, meaning that certain essential individuals were not managing the CBOs as required under the Agreement. However, the Issuers do not rely on these allegations in their request for injunctive relief. (Wolowitz Reply Aff. ¶ 9.)

failure to have apprised Beacon Hill CBO [II and III] of the existence of the SEC's investigation of Beacon Hill; Beacon Hill's consent decree with the SEC to withdraw as manager of the hedge funds; and Beacon Hill's decision not to withdraw as Beacon Hill's CBO [II and III's] portfolio manager.

(Boggess Supp. Aff. in Supp. ¶ 2 and Dyer Supp. Aff. ¶ 2; *see also* Pls. Mem. at 2.) Plaintiffs have no financial interest in the hedge funds but claim that Beacon Hill's handling of those funds jeopardizes their CBOs because of market concern about Beacon Hill's economic condition and credibility.

The Issuers thus seek to trump all contract terms that would require cause to fire Beacon Hill, by relying on Beacon Hill's status as a fiduciary. They claim that since they as clients have lost all trust and confidence in Beacon Hill as fiduciary, Beacon Hill must step down as Portfolio Manager upon the Issuers' request and without penalty to plaintiffs. Beacon Hill objects, relying instead on its rights as detailed in the Agreements. For purposes of this motion, therefore, the Court must assume that plaintiffs cannot terminate Beacon Hill "for cause" as outlined in Section 13 of the Agreement and that termination of Beacon Hill at this point would be a breach of those Agreements that might result in damages.

Lingering in the background of the parties' submissions are other parties to these securitization transactions who have also entered into agreements giving them rights and responsibilities, including the Trustee and the Investors. The Investors, several major financial institutions and other institutional investors (Compl.¶ 2), "purchased the Issuers' securities . . . [and are to be repaid from] the cash flows from the assets in the CBOs managed by Beacon Hill." (Pls. Mem. at 2.) The Investors have certain rights that are explicit in Section 12 and 13 of the Portfolio Management Agreements, including rights to participate in the decision to terminate the Portfolio Manager for cause. For example, pursuant to Section 13, a majority of certain classes of Investors can vote to terminate the Portfolio Manager for cause (Pl.Ex. B, Section 13), and pursuant to Section 12, no termination is effective if a majority of certain Investors reject the Portfolio Manager's successor (Pls. Exs. B and C, Section 12(c)). While one Investor has submitted an affidavit in support of plaintiffs' motion (*see, e.g.,* Wolowitz Reply Aff. Ex. D) and another allegedly requested Beacon Hill's resignation prior to this suit (*see, e.g.,* Compl. ¶ 8; Dyer Rebuttal Aff. ¶ 9), none of the Investors have joined this action. The absence of the Investors is notable since they are significant stakeholders in these sophisticated transactions. Indeed, plaintiffs' Complaint implicitly acknowledges the relevance of the Investors in this dispute, alleging generally that the Investors' "confidence in Beacon Hill" was "shattered" in late October 2002 when the newspapers reported on the hedge fund losses and the SEC investigation (Compl.¶ 4), and describing in detail actions taken by Banc of America Securities, one of the Investors, subsequent to those news reports (*id.* ¶¶ 23–27). The Issuers do not claim, however, that they bring this action on behalf of the Investors, rather than in their own right.

## DISCUSSION

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (emphasis in original) (quoting from CHARLES A. WRIGHT, ARTHUR R. MIL-

LER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed.1995)). Since CBO II and CBO III seek a mandatory injunction that will change the status quo by requiring Beacon Hill to step down as Portfolio Manager, the Issuers' showing must be judged against the higher standard applicable to mandatory injunctions. *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996). Thus, the preliminary injunction may be granted only if plaintiffs have shown (1) that the injunction is necessary to prevent irreparable harm, and (2) there is a "clear" or "substantial" likelihood that they will prevail on the merits. *Id.* (quoting *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir.1995)). Since the Issuers have not established a clear likelihood of success on the merits, they are not entitled to injunctive relief.

For purposes of this motion, it is not disputed that the Issuers have in good faith lost all trust and confidence in Beacon Hill's ability to manage the portfolios. The parties disagree on the purely legal question of whether the equitable principle allowing for termination at will of a fiduciary relationship requires Beacon Hill to step down despite the provisions in the Portfolio Management Agreements that expressly require cause for termination. Plaintiffs assert that the issue is simply "whether Beacon Hill, as fiduciary, must withdraw upon request of its client" (Wolowitz Supp. Aff. ¶ 2), or alternatively, "whether a client of an investment advisor in which the client has lost all trust and confidence is entitled to terminate that fiduciary relationship as of right" (Pls. Reply Mem. at 1). The implication that the questions answer themselves is misleading. In focusing narrowly on the well-established equitable principle that a client may terminate a fiduciary at will upon losing trust and confidence in that fiduciary, plaintiffs ignore the complicated commer-cial context in which they ask the Court to apply this principle.

## I. *The Equitable Principle*

■ There is ample authority in New York law for the general principle that a party to whom a fiduciary duty is owed may terminate its relationship with that fiduciary as of right. Numerous cases illustrate that principle, invalidating certain non-refundable retainer agreements between attorneys and their clients, *see, e.g., Levisohn, Lerner, Berger & Langsam v. Medical Taping Sys., Inc.*, 20 F.Supp.2d 645, 650 (S.D.N.Y.1998), prohibiting excessive limitations on how trustees of pension plans may be terminated, *see, e.g., Partenza v. Brown*, 14 F.Supp.2d 493, 499 (S.D.N.Y.1998), upholding a principal's right to revoke an agent's relationship at any time even if a contract for a definite time exists, *see, e.g., Apollo Technologies Corp. v. Centrosphere Industrial Corp.*, 805 F.Supp. 1157, 1196 (D.N.J.1992), and affirming the right of a principal to terminate its relationship with its real estate broker, *see, e.g., M.R. Dubbs v. Stribling & Assoc.*, 96 N.Y.2d 337, 340, 728 N.Y.S.2d 413, 752 N.E.2d 850 (2001). (*See generally* Pls. Reply Mem. at 11–14.)

The Issuers also assemble a collection of SEC no-action letters that invoke a similar principle in the context of the fiduciary relationship between investment advisors and their clients under the federal securities laws. *See, e.g., BISYS Fund Services, Inc.*, SEC No–Action Letter, 1999 WL 681503 at *7 (September 2, 1999) ("Because certain fee arrangements may have the effect of penalizing a client for ending the advisory relationship, or may make the client reluctant to terminate an unsatisfactory adviser, the staff has taken the position that an adviser's imposition of certain fees upon the termination of an advisory relationship may be inconsistent with the

adviser's fiduciary duty, and may violate Section 206 of the [Investment] Advisors Act"); *Robert D. Brown Inv. Counsel, Inc.*, SEC No–Action Letter, 1984 WL 48400 at *10 (July 19, 1984) (advising that "inclusion in a contract for investment supervisory services of terms ... denying a client's right to terminate the contract would be fraudulent and deceptive because the contract might lead the client to believe that he is not entitled to terminate the contract when fiduciary principles indicate that he has that right").

■ The sound proposition that the Issuers advance is that "[e]ven in commercial and other business dealings a principal, *at least generally*, is permitted to revoke an agency when he pleases, even though he has contracted with the agent for a definite period of time, for the reason that it is deemed contrary to public policy for a principal to have an agent forced upon him against his will." *Smith v. Conway*, 101 N.Y.S.2d 529, 531, 198 Misc. 886, 888 (N.Y.Sup.Ct.1950) (emphasis added). Nor is there any question that Beacon Hill is a fiduciary. Investment advisors who manage funds belonging to others are a classic example of fiduciaries who owe the highest duty of loyalty to those on whose behalf they act. Both New York law and the federal Investment Advisors Act recognize this status and obligation. *See Lowenbraun v. L.F. Rothschild, Unterberg, Towbin*, 685 F.Supp. 336, 343 (S.D.N.Y.1988) (New York law); *Pierce v. Richard Ellis & Co.*, 310 N.Y.S.2d 266, 268, 62 Misc.2d 771, 772 (1970) (New York law); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) (federal law); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191–92, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (federal law).

Nevertheless, the Issuers' effort to formulate a simple syllogism from these elements is misguided. Plaintiffs' failure to cite even a single case in any jurisdiction where this equitable principle has been applied to facts like those present here is significant. Generalized equitable principles must be applied cautiously, and with particular attention to the facts of the situation presented. The need for such careful application of the principle to particular facts is evident even from the very cases relied on by the Issuers. Thus, when granting a preliminary injunction enjoining defendants from holding themselves out as trustees of a pension fund in *Partenza*, the district court considered the entire "framework established by the Trust Agreement" before granting relief, and did not simply conclude that because the trustees act as fiduciaries, they could be dismissed regardless of contractual protections. *Partenza*, 14 F.Supp.2d at 503. The court closely examined the contractual termination procedures and made specific findings as to both the timing and grounds for those decisions. *Id.* at 499–501. The SEC too appears to contemplate consideration of the particular circumstances, often using permissive language, such as "may violate," when describing the validity of contractual provisions imposing fees upon termination. *See, e.g., BISYS Fund Servs.*, 1999 WL 681503 at *7 ("Because certain fee arrangements may have the effect of penalizing a client for ending the advisory relationship ... the staff has taken the position that an advisor's imposition of certain fees upon the termination of an advisory relationship *may be inconsistent* with the advisor's fiduciary duty, and *may violate* Section 206 of the Advisors Act") (emphasis added); *Nat'l Deferred Compensation, Inc.*, SEC No–Action Letter, 1987 WL 108390, at *4.

There is little doubt that a court would properly disregard a provision of a con-

tract between a stockbroker and an ordinary investor, or an attorney and a client, that purported to preclude the client from terminating the relationship without penalty when the client lost confidence upon learning that the fiduciary had been under investigation by the SEC for alleged securities fraud in an unrelated matter. The context of this case, however, is strikingly different from those in which the principle permitting at-will termination of fiduciaries has been applied in the past.

## II. *The Principle Applied to the Instant Securitization Transactions*

■ Describing their relationships with defendant in the simplest and most formalistic way, the Issuers note that they own certain securities, that they gave those assets to defendant to manage, and that they now wish to end those relationships because they have lost trust and confidence in Beacon Hill. (12/12/02 Tr. 5–6.) They argue that the relationship is effectively no different from that in which any individual deposits securities in a brokerage account and permits an investment advisor to trade them for the owner's benefit—a situation in which it would be clear that the account holder could not be required to pay a penalty in order to retrieve her own funds from a fiduciary advisor in whom she had lost confidence.

The analogy, however, ignores the remainder of the complex set of agreements that define the relationships of the parties to these transactions. Those agreements demonstrate that while the relationship between the Issuers and Beacon Hill may be analogous to that of the ordinary investor and stockbroker in form, its economic substance is quite different. Unlike the ordinary investor, the Issuers here have little independent existence, and in fact were created as part of a web of transactions designed to create an investment vehicle to

be marketed by Beacon Hill to the Investors. The Issuers may in form own the assets being managed by Beacon Hill, but those assets were purchased with money borrowed from the Investors, under indentures that effectively and intentionally divests the Issuers of most of the incidents of ownership and control over the assets. The assets are pledged to a Trustee, and are not under the immediate control of the Issuers. Moreover, the Issuers do not have the right, like the ordinary investor, to direct their broker to engage in particular transactions or change investment strategies at will. The indentures specify the types of investment to be made by the Portfolio Manager (Indenture § 1.1, Irwin Aff. Ex. A, at 31, definition of "Collateral Debt Security"), and place specific restrictions on the right to sell the assets in the portfolio or purchase additional assets (*Id.* Article XII). By the terms of the indentures, the Issuers are to purchase the specified types of securities, "at the direction of the Portfolio Manager," or "at the option of the Portfolio Manager." (*Id.*, §§ 3.4(a), 12.2.) The indentures, moreover, do not merely require the Issuers to hire a Portfolio Manager to manage the assets; they *define* the Portfolio Manager as "Beacon Hill Asset Management, L.L.C., . . . unless a successor Person shall have become the portfolio manager *pursuant to the provisions of the Portfolio Management Agreement."* (*Id.* § 1.1, at 53; emphasis added).

Thus, the Issuers have bound themselves to the Investors to invest a specific fund of money in particular ways, at the direction of Beacon Hill as Portfolio Manager, and have committed themselves to retain Beacon Hill in that capacity absent the occurrence of particular events including defined participation of the Investors. These constraints on the owners of the assets, the legality of which (save for the termination restrictions) plaintiffs do not

challenge, are not improperly imposed by a rogue fiduciary attempting to arrogate power to itself at the expense of its client. Rather, they are essential elements in the creation of the securities that are the object of the entire relationship, and exist for the protection of the Investors, who are purchasing investment products on the representation that the securities will be backed by particular types of investments, and not by whatever the Issuers might choose to do with "their" assets.

Similarly, the Investors purchased these products on the equally specific representation that it was Beacon Hill (and indeed, particular employees of Beacon Hill identified as "key men" in the Portfolio Management Agreement (Compl. Exs. B and C, Section 13(g))) that would be managing those assets, except on the occurrence of events specifically defined in the Portfolio Management Agreement, and in reliance on the reputation of Beacon Hill, and not that of the somewhat nebulous Issuers. In keeping with that economic reality, the agreements on which the Investors were entitled to rely permit termination of Beacon Hill as Portfolio Manager if its key personnel ceased to manage the assets of the Issuers, and give the Investors a role in determining whether such a change in personnel, or any of the other events specified as cause for termination, should be invoked.[3]

Under these circumstances, while it is clear that Beacon Hill operates as a fiduciary, in the sense that it is required to act for the benefit of its clients and beneficiaries where its interests might conflict with theirs, it is less clear that the Issuers are the only parties whose interests are to be considered. It is therefore not accurate to characterize the Portfolio Management Agreement as an ordinary investment advisory contract, the tenure and termination provisions of which might be disregarded as an attempt by the advisor to assert rights inconsistent with the basic fiduciary nature of the relationship. Rather, the carefully-negotiated provisions here were drafted by sophisticated lawyers acting on behalf of sophisticated entities, not in an isolated negotiation between the Issuers and the Portfolio Manager, but as part of a series of transactions designed to provide rights to the Investors who provided the assets in the first place based on specific representations as to how the funds would be managed and who would have rights in connection with the transaction. Such carefully negotiated, highly specific rights should not be overridden by a court armed only with general equitable principles, particularly at the behest of entities who may not be the only ones to whom the fiduciary is obligated and who may not have the greatest economic stake in the matter.

Courts have been reluctant to impose fiduciary obligations where the parties to a relationship specified the precise content of their agreements. *See generally Northeast Gen. Corp. v. Wellington Advertising, Inc.,* 82 N.Y.2d 158, 162, 604 N.Y.S.2d 1, 624 N.E.2d 129 (1993) ("[i]f the parties find themselves . . . in the milieu of the 'worka-

---

**3.** For example, if the Portfolio Manager were to resign, the Issuer must use "its best efforts to appoint a successor," but that resignation and appointment are not effective if "the successive Portfolio Manager is rejected" by the majority of certain classes of Investors. (Portfolio Management Agreement, Pls. Ex. B, Section 12(c).) Similarly, the Investors may object by majority vote to the replacement of a "key man" (*id.* Section 13(g)(y)), or may vote on amendments to the Portfolio Management Agreements (*see, e.g.,* Dyer Rebuttal Aff. Ex. H at 126, Offering Memorandum). In general terms, the Investors have unique rights under the Portfolio Management Agreements and other Transaction Documents, and do not simply defer to the Issuers' decisions on issues regarding the management of the portfolios.

day' mundane marketplace, and if they do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them"); *Weinberger v. Kendrick*, 698 F.2d 61, 79 n. 16 (2d Cir.1982) (Friendly, J.) (fact that relationship was product of "arm's-length bargaining" constitutes "serious obstacle[ ]" to extension of fiduciary principles). While these cases may be distinguished as concerning the existence of a fiduciary relationship rather than the incidents of a concededly fiduciary arrangement, they establish that the courts are reluctant to impose duties that conflict with arrangements carefully negotiated by sophisticated business parties to govern their complex relationships.

Plaintiffs contend, however, that "a fiduciary is a fiduciary" (12/12/02 Tr. 3) and deny that there is any "hierarchy of fiduciaries" (*id.* at 10) by which Beacon Hill can be distinguished from the attorney in *Levisohn* or the trustee in *Partenza.* But this is not quite accurate. So many kinds of relationships have been characterized as "fiduciary" for one purpose or another that the Second Circuit has had to caution that outside the field of "shareholder relations,"· the "existence of fiduciary duties in other common law settings . . . is anything but clear." *United States v. Chestman*, 947 F.2d 551, 567 (2d Cir.1991) (en banc). Not all of these relationships automatically imply the application of every duty that has ever been attached to some other sort of fiduciary relation. Even within the "traditional" or "hornbook" examples of "inherently fiduciary relationships," such as those between "attorney and client, executor and heir, guardian and ward, principal and agent, trustee and trust beneficiary, and senior corporate official and shareholder," *id.* at 568, the rule of at will termination without penalty does not universally apply. Most senior corporate officers, for example, have contracts that provide for the payment of severance or other penalties if they are discharged without cause, and such contracts are routinely enforced notwithstanding the universally-accepted status of such officers as fiduciaries. *See, e.g., Ticotin v. Simon Property Group, Inc.*, 289 A.D.2d 143, 735 N.Y.S.2d 54 (1st Dep't 2001) (affirming arbitration award for payment of severance upon termination without cause of president and chief operating officer); *In re Unishops, Inc.*, 553 F.2d 305, 307–308 (2d Cir.1977) (noting that contract for $100,000 payment to chief operating officer in the event of termination was "in all respects valid and supported" and "not in any sense compensation for services rendered or to be rendered" in holding that officer's claim was a priority one in bankruptcy proceeding); David Leonhardt, "Watch it: If You Cheat, They'll Throw Money!," N.Y. TIMES, June 9, 2002, at Sec. 3, p. 1, col. 2 (describing large severance payments for CEOs pursuant to "narrow contract language" severely limiting what constitutes termination for cause despite "a chorus of criticism from investors"). Research has uncovered no case in which a court has refused to enforce such provisions on the ground that, as fiduciaries of the shareholders, senior corporate officers can be fired at will despite contracts of employment limiting the grounds on which they can be dismissed or requiring the payment of severance pay or other benefits that might inhibit the corporation from removing them. The example demonstrates that contractual provisions limiting the right of a client to terminate a fiduciary at will are not necessarily invalid, where they do not involve overreaching by the fiduciary and serve legitimate economic purposes.

The equitable principle invoked by plaintiff cannot be thoughtlessly applied in this

case as if the relationships here were simply identical to those in an ordinary lawyer-client or investor-broker arrangement. The Portfolio Management Agreements here are just two of the many documents that set up a complex arrangement between many highly sophisticated parties in which rights and roles are carefully circumscribed. That the Portfolio Manager is a fiduciary does not mean that the Issuers can unilaterally trump the terms of the Agreements and the interests of others who have relied on those Agreements.[4]

The relief sought in this case is equitable. Tearing down these complicated commercial transactions built on contracts by applying a principle developed in other, far less complicated contexts, is not equitable. Applying that principle here would give the Issuers rights not contemplated by multilateral agreements embodied in documents creating securities issued to the public in a way that could compromise what investors in those securities bargained for. In this context, it is not clear that termination of the Portfolio Manager by the Issuers at will or for good faith loss of trust and confidence are equitable, or that the provisions of the Agreements requiring "cause" and establishing specific procedures for termination violate the equitable principle that clients should not have to maintain fiduciary relationships for fear of penalty.[5]

### CONCLUSION

The Issuers' motion for preliminary and permanent injunction is denied because they have failed to demonstrate a clear likelihood of success on the merits.

SO ORDERED.

---

**4.** The Court need not address the situation that might arise if *all* affected parties sought removal of the Portfolio Manager on grounds of loss of trust and confidence. That is not the situation before the Court.

**5.** The Issuers also argue (Pls. Reply Mem. at 8–10) that the Agreements contemplate the relief requested here since they include "or otherwise" as a grounds for termination (Section 8) and general provisions subjecting the Agreements to equitable principles (Section 16). These subsidiary arguments do not change the inequities of applying an oversimplified equitable principle to this situation, nor do they give any meaningful notice of the creative reason for termination urged by the Issuers in this motion.